# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DARRELL MILSAP,

      Plaintiff,

      v.

CITY OF CHICAGO, et al.,

      Defendant.

Case No. 16-cv-4202

Judge John Robert Blakey

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Darrell Milsap was employed by the City of Chicago's Department of Streets and Sanitation (DSS) until May 22, 2015, when he resigned. He sued the City *pro se* in April 2016 [1] and filed an amended complaint in February 2017 [31]. In May 2017, this Court dismissed Plaintiff's *pro se* complaint for failure to state a claim, but gave him leave to amend. In August 2017, then with assistance of counsel, Plaintiff filed a second amended complaint (SAC) [49], naming for the first time individual defendants along with the City. Defendants again moved to dismiss [57], and the Court granted in part and denied in part the motion [64, 65]. Again, the Court gave Plaintiff leave to amend. In February, Plaintiff filed a third amended complaint (TAC) [66]. The City and the individual Defendants have again moved to dismiss. *See* [71]. For the reasons explained below, the Defendants' Motion to Dismiss is granted in part and denied in part.

A.    Plaintiff's Amended Allegations

Plaintiff alleges that, after working for DSS for seventeen years, the City wrongfully terminated him because he "came forward to disclose corruption, favoritism, nepotism and violations of various laws and regulations by City employees in the course of an official investigation." TAC [66], ¶ 1. Plaintiff alleges that he "also endured years of harassment at the hands of [his immediate supervisor, Harold] Irving, and others, due to a disabling back injury." *Id.*, ¶ 5. Plaintiff names as Defendants the City of Chicago; Harold Irving (who was the DSS Division 5 Superintendent and Plaintiff's immediate supervisor); Lemuel Austin (Superintendent for the 34th Ward); Gerald Brown (DSS Foreman of Motor Truck Drivers); and Alderman Carrie Austin (who represents the 34th Ward in the Chicago City Council). *Id.*, ¶¶ 8-12. The TAC alleges two counts of First Amendment retaliation in violation of 42 U.S.C. § 1983, one against the City and one against Defendants Irving, Brown, L. Austin and Alderman Austin (respectively, counts I and II). The remaining counts are asserted against the City only: disability harassment and hostile work environment in violation of the Americans with Disabilities Act (ADA) (count III); violation of the Illinois Whistleblower Act (count IV); and retaliatory discharge (count V). *Id.*, ¶¶ 88-144. Plaintiff also asserts an indemnification claim (count VI). *Id.*, ¶¶ 145-47.

With regard to his disability, Plaintiff alleges that he sustained a workplace injury in 2006 causing disabling back pain. TAC [66], ¶ 16. As a result of his disabling back pain, Plaintiff was assigned to a "light duty" position as a restricted

clerk, which allowed him to avoid driving long distances and doing manual labor. His responsibilities included managing schedules, vacation and sick time, and "other personnel matters" for his division. *Id.*, ¶¶ 18-19. From 2006 until his alleged forced resignation, Plaintiff was granted intermittent leave to seek physical therapy. *Id.*, ¶ 20. Plaintiff alleges that Defendant Irving created a hostile work environment and harassed Plaintiff because of his disability by: (a) disciplining Plaintiff for taking approved leave to treat his disability; (b) damaging Plaintiff's property on his office desk; (c) repeatedly verbally abusing Plaintiff in front of other City employees; (d) upon information and belief, disparaging Plaintiff to other City employees; (e) forcing Plaintiff to perform work outside of his light duty restrictions, and threatening to discipline Plaintiff if he did not perform such work; and (f) using derogatory names such as "broke-back" and "cripples". *Id.*, ¶ 22. Plaintiff also alleges that other City employees followed suit and "forced Plaintiff to perform work outside of his light duty restrictions and verbally abused Plaintiff due to his disability." *Id.*, ¶ 25. Plaintiff alleges that he filed numerous complaints with the City regarding Irving's harassment, but the City failed to stop the alleged "offensive, severe and pervasive" harassment "throughout his employment." *Id.*, ¶¶ 23, 27-28. Plaintiff alleges that he endured additional harassment in retaliation for making the complaints with the City. *Id.*, ¶ 29.

Plaintiff also alleges that, on December 10, 2012, he was involved in a car accident while performing a mail run for the City on Irving's orders. *Id.*, ¶ 30. Kenneth Austin, who plaintiff alleges is Defendant Alderman Austin's son and

Defendant Irving's cousin, was driving the vehicle at the time of the accident, though he did not have a valid driver's license. *Id.*, ¶ 31, 36, 38, 46. After their vehicle was rear-ended, Plaintiff called Defendant Brown (the Driver Foreman). Plaintiff informed Brown that K. Austin was driving the vehicle at the time of the accident, to which Brown responded "I don't want to hear none of that." Brown directed Plaintiff to call Defendant Irving, who instructed Plaintiff to call the police. *Id.*, ¶¶ 40-42. Plaintiff and K. Austin drove to the police station to report the accident and were met by Defendants Irving and L. Austin (K. Austin's brother and then the Superintendent for the 34th ward). *Id.*, ¶¶ 43-44. Plaintiff alleges that Irving and K. Austin pressured him to tell the police that he was driving the vehicle at the time of the incident; they told him that he needed to "take care of Kenny" and that K. Austin could not "go down for this." *Id.*, ¶ 47. Plaintiff resisted this pressure at first, stating that he "would not play a role in falsifying information and lying to the police. *Id.*, ¶ 48. Defendant Irving responded by saying if Plaintiff did not "take care of Kenny," he would lose his job. *Id.*, ¶ 49. Plaintiff acquiesced and falsified an accident report, stating he was the driver at the time of the accident. *Id.*, ¶ 51.

Plaintiff alleges that Alderman Austin instructed Plaintiff to "stick to the story" and "continue to say he was driving during the accident 'or else.'" *Id.*, ¶ 58. On April 24, 2013, Plaintiff was interviewed as part of an investigation by the City's Office of the Inspector General regarding suspected preferential treatment of K. Austin on behalf of the City. *Id.*, ¶¶ 60-61. Plaintiff reiterated the story he told the

police during this interview, stating he was the driver during the December 2012 incident. *Id.*, ¶ 62. About a month later, Plaintiff "voluntarily sought" a second interview with the OIG because he wanted "to disclose the actual events of the December 2012 accident and to expose corresponding issues of nepotism, favoritism and corruption." *Id.*, ¶ 63. During the second interview, which took place on May 29, 2013, Plaintiff told the OIG that K. Austin was actually the driver at the time of the accident. *Id.*, ¶ 64-65. Plaintiff alleges that he voluntarily gave this second interview "for the primary purpose of exposing the City's corruption, favoritism and nepotism," because he knew he had "a responsibility, as a private citizen, to speak out" against the City's corrupt practices. *Id.*, ¶ 67. Plaintiff alleges that he was motivated to speak "to clear his name" after his character had been tarnished. *Id.*, ¶ 71. Plaintiff alleges that in disclosing the truth to the OIG, he "blew the whistle" and "acted against his own self-interest to tell the truth. *Id.*, ¶ 72. Following his truthful disclosure, Plaintiff allegedly suffered retaliation in the form of verbal harassment and threats to his job security. *Id.*, ¶ 73.

Plaintiff alleges that the OIG closed its investigation in late March 2015, and the City fired him on May 17, 2015. *Id.*, ¶¶ 77-78. Plaintiff alleges that City Commissioner Charles Williams told Plaintiff that the City was firing him because he "didn't stick to his story" and "broke the law." *Id.* Plaintiff alleges that "the City terminated Plaintiff's employment in retaliation for Plaintiff's exposure of its corruption, favoritism, and nepotism." *Id.*, ¶ 79. Plaintiff was given the option to resign and receive certain benefits, and Plaintiff exercised that option. *Id.* Plaintiff

later learned that Alderman Austin told the City that if her son, K. Austin, "was going to be terminated, Plaintiff needed to be terminated as well." *Id.*, ¶ 80. This statement "led to Plaintiff's termination." *Id.*

The TAC, like the Second Amended Complaint, alleges First Amendment retaliation (counts I and II), violation of the ADA (count III), violation of the Illinois Whistleblower Act (count IV), and retaliatory discharge (count V); as before, Plaintiff also asserts an indemnification claim (count VI). Defendants again moved to dismiss all counts [71], arguing that Plaintiff's new allegations still fail to state claims for violation of the First Amendment or the ADA. Defendants also argue that the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims.

## B.    Legal Standard

A motion to dismiss under Rule 12(b)(6) "challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). A motion to dismiss tests the sufficiency of a complaint, not the merits of a case. *Autry v. Northwest Premium Servs., Inc.*, 144 F.3d 1037, 1039 (7th Cir. 1998). To survive a motion to dismiss, a complaint must first provide a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice" of what the claim is "and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Additionally, the complaint must contain

"sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). That is, the allegations must raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs. Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). A claim has facial plausibility "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The "amount of factual allegations required to state a plausible claim for relief depends on the complexity of the legal theory alleged," but "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008). In evaluating the complaint, the Court accepts all well-pleaded allegations as true and draws all reasonable inferences in favor of Plaintiff. *Iqbal*, 556 U.S. at 678. The Court need not, however, accept legal conclusions or conclusory allegations. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

C.    <u>Discussion & Analysis</u>

Defendants moved to dismiss all of the claims asserted in the TAC. This Court considers the sufficiency of Plaintiff's allegations below.

1.    <u>Plaintiff's First Amendment Retaliation Claims (Counts I and II)</u>

Defendants argue that Plaintiff's First Amendment retaliation claims against the City and against individual Defendants fail, because Plaintiff cannot allege that he spoke as a private citizen and cannot allege that he spoke on a matter of public

concern. Whether a government employee's speech "addresses a matter of public concern depends upon 'the content, form and context [of the speech] as revealed by the whole record.'" *McGreal*, 369 F.3d at 672-73 (7th Cir. 2004) (quoting *Gustafson*, 290 F.3d 895, 906-07 (7th Cir. 2002); *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)). Plaintiff alleges that he was discharged after "exposing the City's corruption, favoritism and nepotism." TAC [66], ¶ 67. Though "our cases have consistently held that speech alleging government corruption and malfeasance is of public concern in its substance," *Spiegla v. Hull*, 371 F.3d 928, 937 (7th Cir. 2004); *see also Sullivan v. Ramirez*, 360 F.3d 692, 699 (7th Cir. 2004); *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219-20 (7th Cir. 1994), "before analyzing whether an employee's speech is of public concern, a court must determine whether the employee was speaking 'as a citizen' or, by contrast, pursuant to his duties as a public employee." *Sigsworth v. City of Aurora, Ill.*, 487 F.3d 506, 509-10 (7th Cir. 2007) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). This Court has previously determined that Plaintiff spoke pursuant to his duties as a public employee, *see* [65] at 7-8. Nothing in the TAC changes that result.

When a public employee reports "official misconduct in the manner directed by official policy, to a supervisor, or to an external body with formal oversight responsibility," he speaks pursuant to his official duties and his "speech is unprotected by the First Amendment.'" *Rose v. Haney*, No. 16 CV-5088, 2017 WL 1833188, at *5 (N.D. Ill. May 8, 2017) (citing *Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 904 (N.D. Ill. 2016)). Similarly, an employee who "reports misconduct

affecting an area within his responsibility (even when not strictly required to report it), also speaks pursuant to his official duties." *Id.* (citing *Hatcher v. Bd. of Trs. of S. Ill. Univ.*, 829 F.3d 531, 539 (7th Cir. 2016)). An employee does not speak "pursuant to his official duties when he either 'testifies regarding misconduct to a jury or grand jury, or reports misconduct outside established channels or in violation of official policy.'" *Id.* (quoting *Spalding*, 186 F. Supp. 3d at 904).

Plaintiff alleges that he "voluntarily initiated" the second interview with the OIG, believing he had a responsibility, "as a private citizen, to speak out against the City's dishonest and unethical practices." TAC [66], ¶¶ 63, 67, 93. Plaintiff additionally alleges that this voluntary action falls outside the scope of his employment duties. *See id.*, ¶ 19 ("As a Restricted Clerk, Plaintiff managed schedules, vacation and sick time, and other personnel matters for DSS Division 5. Plaintiff was also responsible for liaising with other departments when necessary to advise regarding DSS Division 5 personnel issues and manage such issues with those departments."); ¶ 94 ("Plaintiff's official job duties did not include participation in OIG investigations, nor did they require Plaintiff to voluntarily give a second interview in any such investigation.").

Plaintiff's attempt to narrowly characterize his job duties does not alter the Court's previous findings as to this claim. The inquiry into Plaintiff's job duties is not limited by formal job descriptions but rather requires a practical approach. "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's

written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424-25. In *Garcetti*, the Plaintiff Deputy District Attorney filed a § 1983 retaliation claim, alleging that he was retaliated against for a memorandum he wrote that detailed misrepresentations in a previously filed affidavit. The Supreme Court found his speech unprotected by the First Amendment, as the memo was written pursuant to his official duties – duties that, in practice, included supervising attorneys, investigating charges, and preparing filings. *Id.* at 422. "When [Ceballos] went to work and performed the duties he was paid to perform, Ceballos acted as a government employee," and his speech was unprotected. *Id.*

This Court need not exhaustively list Plaintiff's employment duties, as the principle announced in *Rose v. Haney*, *supra*, removes Plaintiff's speech from First Amendment protection altogether. Though Plaintiff alleges that he gave a second interview voluntarily, the OIG was already acting as a formal oversight body and continued to act as a formal oversight body for at least two years after Plaintiff gave his second interview. TAC [66], ¶¶ 60-62; 78. Plaintiff may have sought out the OIG for a second interview, but the practical duties of his employment included presumptively truthful compliance with workplace investigations. *See* MTD [71]; Response [74] (citing MCC § 2-56-090. "It shall be the duty of every … employee … to cooperate with the inspector general in any inquiry.").

*Kubiak v. City of Chicago,* 810 F.3d 476 (7th Cir. 2016), is also illustrative. In that case, a patrol officer sued the City alleging that she was retaliated against after reporting workplace harassment. The Seventh Circuit rejected Plaintiff's attempt to narrowly characterize her official duties. *Id.* at 481. Recognizing that her experiences were horrific, the court nonetheless determined that "generally, an employee who is verbally assaulted by a colleague would be expected to report the inappropriate behavior." *Id.* at 481-82. The speech was "intimately connected to [Plaintiff's] job," as the event occurred at work, escalated after a work-related report, and was reported to an individual with supervisory responsibilities. *Id.* at 482.

Despite Plaintiff's claims that he felt he had a "responsibility as a private citizen to speak out," the fact remains that he spoke to the OIG, a supervisory body already investigating the City department. TAC [66], ¶ 67. Such speech concerned actions that occurred in the workplace and a conflict that arose within the workplace, and was "intimately connected" with Plaintiff's job. Accordingly, Plaintiff spoke pursuant to his official duties, and his speech is not entitled to First Amendment protection. Plaintiff's First Amendment claims (Claims I and II) are dismissed with prejudice.

### 2. Plaintiff's Hostile Environment Claim (Count III)

In his last complaint, Plaintiff alleged discrimination and retaliation in violation of the ADA. The Court dismissed those claims because Plaintiff failed to allege an adverse employment action taken because of his disability. In his Third

Amended Complaint, Plaintiff asserts a hostile environment claim in violation of the ADA. Defendants argue that Plaintiff's ADA Hostile Environment Claim should be dismissed, as Plaintiff both failed to allege specific dates when the alleged acts occurred and failed to plead a sufficiently severe work environment. MTD [71], p. 12. The Seventh Circuit has not explicitly decided whether a claim for hostile work environment is cognizable under the ADA, though courts "have assumed the existence of such claims where resolution of the issue has not been necessary." *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005) (citing *Conley v. Village of Bedford Park*, 215 F.3d 703, 712-13 (7th Cir. 2000)).

The framework for analyzing the adequacy of a hostile work environment claim under the ADA mirrors the framework for hostile work environment claims under Title VII. *Silk v. City of Chicago*, 194 F.3d 788, 804 (7th Cir. 1999). To prevail on a hostile environment claim, a plaintiff must also show that: (1) his work environment was both subjectively and objectively hostile; (2) his disability was the cause of the harassment; (3) the harassment was severe or pervasive; and (4) there is a basis for employer liability. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010). A hostile work environment exists where an employee "experiences harassment that is 'so severe or pervasive as to alter the conditions of employment and create an abusive working environment.'" *Mannie*, 394 F.3d at 982 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)). A plaintiff can establish an alteration in the terms and conditions of employment "by demonstrating either a tangible employment action, such as discharge or demotion, or a non-tangible

action, such as discriminatory conduct that is so severe or pervasive as to create an 'abusive' working environment.'" *Id.* *See also Silk*, 194 F.3d at 804-05. In determining whether a plaintiff has met the standard, "courts must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Silk*, 194 F.3d at 804. *See also Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014).

The threshold for establishing a hostile work environment is high, as the "workplace that is actionable is one that is hellish.'" *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Accordingly, many work environments, though uncomfortable and unprofessional, fail to meet this exceedingly high bar. *See, e.g., Silk*, 194 F.3d at 808 (finding that verbal harassment, including being called a "useless piece of [vulgarity]," a "limited duty phony," and a "medical abuser," and references to plaintiff's "[vulgarity] medical problems," when combined with negative performance reviews and being sent home from work, was not sufficiently severe); *Ammons v. Dart*, No. 16-CV-7770, 2018 WL 2096372, at *6 (N.D. Ill. May 7, 2018) (finding that a supervisor ridiculing Plaintiff multiple times by telling him to "go take [his] medicine" and preventing him from taking his insulin shots in a timely manner did not demonstrate a sufficiently hostile environment); *Coffey-Sears v. Lyons Twp. High Sch. Dist.* 204, No. 15-CV-08642, 2017 WL 1208439, at *13 (N.D. Ill. Mar. 31, 2017)

(coworkers' comments directly criticizing Plaintiff's accommodation were not severe or pervasive but a "common workplace dispute"); *McKay v. Vitas Healthcare Corp. of Ill.*, 232 F. Supp. 3d 1038, 1047 (N.D. Ill. 2017) (finding that a single comment that a hearing-impaired individual doesn't "hear anything half the time anyways" was not sufficiently pervasive or severe to create an abusive working environment); *Alanis v. Metra*, No. 13-CV-5962, 2016 WL 464043, at *8 (N.D. Ill. Feb. 8, 2016) (after Plaintiff's request for a fragrance-free workplace, supervisor applying perfume on an unknown number of occasions in Plaintiff's presence, wearing heavy perfume and threatening to discipline Plaintiff after Plaintiff's complaint suggested a hostility that was not serious enough to render the environment an abusive one); *Arce v. Chi. Transit Auth.*, No. 14-C-102, 2015 WL 3504860, at *5 (N.D. Ill. June 2, 2015) (quoting *Salvadori v. Franklin Sch. Dist.*, 293 989, 997 (7th Cir. 2002)) (labeling Plaintiff a "useless Puerto Rican" was not sufficiently egregious, as "the mere utterance of a racial epithet that engenders offensive feelings does not sufficiently affect the conditions of employment to create a hostile work environment").

Plaintiff alleges that Defendant Irving created a hostile work environment and harassed Plaintiff because of his disability. TAC [66], ¶ 22. Plaintiff alleges that Irving called Plaintiff derogatory names such as "cripples" and "broke-back," disciplined him for taking lawful leave to treat his disability, forced Plaintiff to perform work outside his disability restrictions, and verbally abused him on a near-daily basis. *Id.* ¶ 5.

Certainly, calling someone a "cripple" is unprofessional and offensive, but such simple remarks generally fail to rise to the requisite level of abusive for a hostile work environment claim. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("simple teasing," offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment"; "conduct must be extreme to amount to a change in the terms and conditions of employment"). In this case, however, Plaintiff alleges that Irving subjected him to verbal abuse on a "near-daily basis" – unquestionably pervasive as alleged. In *Passananti v. Cook County*, 689 F.3d 655, 666 (7th Cir. 2012), the Seventh Circuit observed that the repeated and hostile use of the word "bitch" could support a sexual harassment claim. This case presents an analogous situation, and thus, at this point in the proceedings, the Court will deny the motion to dismiss Plaintiff's hostile work environment claim.

3.     Plaintiff's State Law Claims (Counts IV, V, and VI)

Defendants argue that, if the Court grants the motion to dismiss as to Plaintiff's federal claims, it should decline to exercise supplemental jurisdiction over Plaintiff's state law claims. In light of the Court's decision above concerning Plaintiff's ADA hostile environment claim, however, the point is moot.

Plaintiff's Whistleblower and retaliatory discharge claims (counts IV and V) survive for the same reasons they survived the last time. Plaintiff's indemnification claim (count VI) fails again because, as before, none of the surviving claims is asserted against the individual defendants.

<u>Conclusion</u>

For the reasons explained above, Defendants' Motion to Dismiss [71] is granted as to counts I, II, and VI, and denied as to counts III, IV, and V. The status hearing previously set for July 12, 2018 stands. The parties should be prepared at that time to set all remaining case management dates.

Dated: July 10, 2018

ENTERED:

_____
John Robert Blakey
United States District Judge