# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DARRELL MILSAP, | |
| Plaintiff, | Case No. 16-cv-4202 |
| v. | |
| CITY OF CHICAGO, | Judge John Robert Blakey |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on Defendant's motion for summary judgment [109]. For the reasons explained below, the Court grants the motion.

A.  Facts & Procedural History[1]

Plaintiff Darrell Milsap was employed by the City of Chicago's Department of Streets and Sanitation (DSS) from August 1, 1999 until May 22, 2015, when he resigned. [110], ¶ 1. Plaintiff began his employment as a laborer, and worked in several bureaus within DSS until 2006, when he injured his leg; he remained on duty disability leave until approximately late 2007 or early 2008, when he returned to work as a night watchman. *Id.* at ¶¶ 2–4, 6. Following surgery, Plaintiff received a permanent work restriction limiting his ability to lift and walk. *Id.* at ¶ 5. From 2011 until at least 2013 or 2014, Plaintiff worked as a restricted clerk. *Id.* at ¶ 7. On May 1, 2014, Plaintiff became a field sanitation specialist, a job he held

---

[1] This section comes from Defendant's statement of undisputed facts [110], Plaintiff's response thereto [116], Plaintiff's statement of additional facts (where supported) [115], and Defendant's response thereto [119].

until he resigned on May 29, 2015. *Id.* at ¶¶ 8–9. Plaintiff admits that he resigned, but claims that his resignation was forced, not voluntary. [116], ¶ 9. In either case, the City rehired Plaintiff in November 2016 as a seasonal pool motor truck driver, a job he still holds today. [110], ¶ 10; [116], ¶ 10.

During the time Plaintiff worked as a restricted clerk, Plaintiff reported to division superintendent Harold Irving. [110], ¶ 12. Irving supervised Plaintiff from approximately September of 2011 through approximately August of 2013. *Id.* at ¶ 14. Plaintiff claims that throughout his tenure under Irving, Irving: called Plaintiff names, such as "cripple" or "broke-back"; threw Plaintiff's office supplies and belongings into the garbage; unplugged Plaintiff's computer; coughed and spit on Plaintiff's phone; and embarrassed Plaintiff in front of other employees. *Id.* at ¶ 17; [116], ¶ 17. Plaintiff claims that the harassment continued "to a certain extent" after he moved to the field sanitation specialist job in 2014. [110], ¶ 21; [115], ¶¶ 5–6. Specifically, Plaintiff claims that Irving would "ask around" about Plaintiff, his whereabouts, and the City vehicle he was driving. [115], ¶ 7. Irving denies that he did any of these things. [110], ¶ 20.

On December 10, 2012, Plaintiff was involved in an accident while making a mail run with Kenneth Austin, another laborer; the City vehicle was rear ended. *Id.* at ¶ 25. When reporting the accident to the Chicago Police Department, Plaintiff reported that he was driving the truck at the time of the accident. *Id.* at ¶ 26. Plaintiff also prepared a City of Chicago Vehicle Accident Report stating that he was driving the truck when it was hit. *Id.* at ¶ 27. Plaintiff claimed that Irving

2

and another supervisor, Gerald Brown, pressured him to say that he was driving and forced him to list himself as the driver on the accident report, when, in fact, Kenneth Austin was driving at the time of the accident. [116], ¶¶ 26, 27. Plaintiff claims that Irving threatened to fire him if he reported Kenneth Austin as the driver. *Id.*

In 2013, the Officer of the Inspector General investigated the December 10, 2012 accident. [110], ¶ 29. Plaintiff submitted to two interviews; in the first, on April 24, 2013, Plaintiff stated—at least a dozen times, under oath—that he was driving the truck at the time of the accident *Id.* at ¶¶ 30–31. Plaintiff admits that he made such false statements under oath but claims that he only did so under duress because Irving, Brown, and Kenneth Austin's mother, Alderman Carrie Austin, allegedly threatened him. [116] at ¶¶ 30–31. In the second OIG interview, conducted May 29, 2013, Plaintiff stated that he had made a "mistake" in his first interview and that, in fact, Kenneth Austin had been driving at the time of the December 2012 accident. [110], ¶ 36. Plaintiff claims the OIG conducted the second interview at his request, and that he initiated the second interview because he wanted to set the record straight, come clean and tell the truth about being forced to lie. [110], ¶¶ 33–34; [116], ¶¶ 33–34. Yet, at the second interview, Plaintiff told the OIG that he had not felt pressured, harassed, or intimidated. [110], ¶ 40.

Ultimately, OIG prepared a report concerning the December 10, 2012 accident; OIG informed then-Commissioner Charles Williams that Kenneth Austin and Plaintiff both violated Illinois law and City of Chicago Personnel Rules and

3

recommended that both employees be disciplined, up to and including termination. [110] at ¶¶ 45–47. On May 7, 2015, Commissioner Williams asked the City's Law Department to prepare charges seeking both employees' termination. *Id.* at ¶ 52. Williams placed a courtesy call to Alderman Carrie Austin to advise her of the charges, and, the next day, on May 11, 2015, Kenneth Austin submitted his notice of resignation. *Id.* at ¶¶ 53, 55. Plaintiff submitted his notice of resignation on May 29, 2015. *Id.* at ¶ 63. Plaintiff claims that he "was forced to resign or face disciplinary action," allegedly "in retaliation for exposing the City's corruption, favoritism, and nepotism." [116], ¶ 63.

On August 10, 2015, Plaintiff filed a charge of discrimination with the EEOC, alleging discrimination based on age and disability. [110], ¶ 64. The EEOC issued a right-to-sue letter on February 3, 2016. *Id.* at ¶ 65.

On April 11, 2016, Plaintiff submitted a *pro se* complaint in this Court, alleging age and disability discrimination, [1]. He filed an amended complaint in February 2017 alleging discrimination based solely on disability, [31]. In May 2017, this Court dismissed Plaintiff's *pro se* complaint for failure to state a claim, having determined that Plaintiff failed to allege that his firing was tied to his disability. *See* [43]. The Court, however, gave Plaintiff leave to amend, and, in August 2017, now with assistance of counsel, Plaintiff filed a second amended complaint (SAC) [49], which, for the first time, named individual defendants along with the City, and alleged, in addition to disability discrimination, First Amendment retaliation, violation of the Illinois Whistleblower Act (IWA), and retaliatory discharge. The

Court dismissed Plaintiff's First Amendment and ADA claims but allowed Plaintiff's IWA and retaliatory discharge claims to proceed. *See* [64], [65].

Plaintiff filed a Third Amended Complaint, [66], on February 9, 2018, again asserting First Amendment claims, an ADA claim (now cast as a hostile work environment claim), and IWA and retaliatory discharge claims. Once again, the City and the individual Defendants moved to dismiss, [71], and, once again, this Court granted the motion in part and denied it in part. *See* [83]. The Court once again dismissed Plaintiff's First Amendment claims, this time with prejudice, and once again allowed Plaintiff's IWA and retaliatory discharge claims to proceed. *Id.* But based upon the amended allegations concerning Plaintiff's disability discrimination claim, the Court this time allowed the ADA claim to proceed. In particular, the Court found that Plaintiff's allegations that Irving called him a cripple and broke-back on a near-daily basis may be sufficient to state a hostile work environment claim under the ADA. *Id.*

Thereafter, the parties conducted discovery on Plaintiff's remaining claims. Now, upon a fully-developed factual record, Defendant once again seeks to dispose of Plaintiff's claims: Defendant seeks summary judgment on counts III, IV, and V of the TAC. *See* [109].

B. <u>Legal Standard</u>

Summary judgment is proper where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is

5

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). The non-moving party has the burden of identifying the evidence creating an issue of fact. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

C. Discussion & Analysis

Defendant seeks summary judgment on all of the remaining claims asserted in the TAC, Plaintiff's hostile work environment ADA claim (count III), his IWA claim (count IV), and his retaliatory discharge claim (count V). This Court considers each below.

6

1. Plaintiff's ADA Hostile Work Environment Claim

In the TAC, Plaintiff claims that his supervisors, Harold Irving and Gerald Brown, harassed him because of his disability, creating a hostile work environment, in violation of the ADA. Initially, a hostile work environment claim may not even be viable under the ADA. As this Court noted in its prior decision, the Seventh Circuit has not explicitly decided whether a claim for hostile work environment is cognizable under the ADA. *E.g., Yochim v. Carson*, No. 18-3670, 2019 WL 3822158, at *5 (7th Cir. Aug. 15, 2019) (declining to decide whether hostile work environment claim is actionable under the ADA); *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009) (same). But even if such a claim exists, Plaintiff cannot win on his claim here, both because he filed his EEOC charge too late and because the evidence undermines his allegations concerning harassment.

Under the ADA, a plaintiff has 300 days from the occurrence of an allegedly discriminatory act in which to file a timely charge with the EEOC. 42 U.S.C. § 12117(a). A plaintiff's failure to file a timely charge bars his suit. *See Calvin v. Sub-Zero Freezer, Co.*, 697 F. App'x 874, 875 (7th Cir. 2017) (citing *Salas v. Wis. Dep't of Corr.,* 493 F.3d 913, 921 (7th Cir. 2007)). Thus, Plaintiff's ADA hostile work environment claim is time-barred if it accrued before October 14, 2014 (300 days before he filed his August 10, 2015 charge with the EEOC). And summary judgment in Defendant's favor is appropriate if there is no genuine dispute as to whether Plaintiff's claims accrued before that date.

Plaintiff alleged in his complaint that Irving verbally abused him and harassed him, because of his disability, on a near-daily basis. But it is undisputed that Irving only supervised Plaintiff from approximately September 2011 until August 2013. [116], ¶ 14. In fact, Irving left the City on November 1, 2013. *Id.* at ¶ 16. Thus, the potentially actionable conduct—the conduct alleged in the TAC—all occurred more than 300 days before Plaintiff filed his EEOC charge.

Plaintiff claims that his claim is timely because his harassment continued "to a certain extent" even after he was out from under Irving. *Id.* at ¶ 8. Plaintiff claims that Irving "asked around" about him, asking about his whereabouts or what City vehicle he was driving. Plaintiff also claims that Lemuel Austin, Kenneth Austin's brother, harassed him in the early spring of 2015 when he approached Plaintiff at a local baseball game and "threatened to jump on" Plaintiff and "kick [his] ass." [115], ¶ 6. He also claims that strangers would "drive by his house, stand[] in his driveway, and mak[e] death threats."[2] *Id.* at ¶ 26.

Putting aside the question of whether this conduct (if true) remains actionable as alleged, Plaintiff offers no evidence to tie any of it to his disability. In fact, Plaintiff testified at his deposition that Lemuel Austin threatened him because Austin had heard that Plaintiff called the 34th ward (the Austin's ward) "filthy." [110-3], p. 14. And he testified that "the threats, the drive-bys, the walk-bys" all related to his decision to tell the truth about Kenneth Austin driving the truck. *Id.* at 45 ("I lived on that block 19 years and never had an issue. My problems didn't

---

[2] When pressed at his deposition to describe or explain the "threats," Plaintiff testified that Ramona Perry told him that "Gerald Brown and Lemuel told [her] that [Plaintiff] needed to stay – needed to go back to Georgia because they had something for [Plaintiff's] ass." [110-3], at p. 44.

8

start until after [the accident] happened."). In other words, Plaintiff cannot show that the harassment occurring under Irving (potentially actionable, but outside the statute of limitations period), relates in any way to the harassment occurring within the statute of limitations period (potentially timely, but not actionable as a disability claim). As a result, the continuing violation doctrine cannot save Plaintiff's claim. *See, e.g., Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000) (under continuing violation doctrine, plaintiff may recover for a time-barred act by linking it with an act that is within the limitations period); *Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 345 (7th Cir. 1999) (continuing violation doctrine is designed to accommodate plaintiffs who can show a pattern or policy of discrimination continuing from outside the limitations period into the statutory limitations period, so that all discriminatory acts committed as part of this pattern or policy can be considered timely).

Even if Plaintiff's claim were timely (and somehow tied to his disability), it would nonetheless fail on the merits based upon record. To prevail on a hostile environment claim, a plaintiff must show that: (1) his work environment was both subjectively and objectively hostile; (2) his disability was the cause of the harassment; (3) the harassment was severe or pervasive; and (4) there is a basis for employer liability. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010). Relevant to this inquiry are "'the severity of the alleged conduct, its frequency, whether it [wa]s physically threatening or humiliating (or merely offensive), and whether it unreasonably interfere[d] with the employee's work

9

performance.'" *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 636 (7th Cir. 2019) (quoting *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018)). To survive summary judgment, Plaintiff must provide evidence sufficient to allow a reasonable jury to find that Irving's conduct "was severe or pervasive enough to constitute a hostile work environment." *Robinson*, 894 F.3d at 828.

Plaintiff survived Defendant's motion to dismiss, not because he alleged harassment that was severe (as explained in the Court's prior decision, he has not), but because he alleged harassment that was pervasive. In fact, he alleged that Irving called him derogatory names such as "cripple" and "broke-back" and "verbally abused him on a near-daily basis." [66] ¶ 5. Analogizing to *Passananti v. Cook County*, 689 F.3d 655, 666 (7th Cir. 2012), where the Seventh Circuit observed that the repeated and hostile use of the word "bitch" could support a sexual harassment claim, this Court allowed Plaintiff's claim to proceed. Unfortunately for Plaintiff, the evidence adduced during discovery does not support his allegation concerning the pervasive nature of the alleged harassment. Realizing as much, Plaintiff now has omitted any claim that the abuse occurred on a near-daily basis. *See* [115], ¶ 3 (claiming Irving "verbally abused [him] due to his disability, calling him names, throwing his personal belongings in the garbage, unplugging his computer, coughing and spitting on his phone, cursing at him, and embarrassing him in front of others.").

At his deposition, Plaintiff claimed that, during his tenure as a restricted clerk in the 5th District, Gerald Brown and Harold Irving both harassed him. In

10

particular, he testified, Brown "tried to force me to do some of his work. I guess he was maybe computer illiterate. And when I refused, he would curse me out and call me – that had a little joke, broke back, crippled mother fucker, things of that nature." [110-3], at p. 15. When asked how Irving harassed him, he testified: "A lot of verbal abuse, name calling, a lot of throwing my personal belongings in the garbage, unplugging my computer, coughing and spitting on the phone, embarrassing me in front of people, cursing me out in front of people, the name calling in front of people." *Id.* When asked when these things happened, Plaintiff testified that he had "a few dates of him–the things he did. I had a diary." *Id.* But he testified that he could not remember any specific dates without the diary in front of him. *Id.* at p. 16. Such testimony undermines the prior claim that Irving harassed Plaintiff on a near-daily basis. If Irving had actually abused him on a near-daily basis, Plaintiff would have said so, and would not have needed a diary marking specific dates to remind him of the frequency of his harassment. From the evidence in this record, Plaintiff offers no basis for a reasonable jury to find Irving's conduct (or anyone else's conduct) to be severe or pervasive enough to constitute a hostile work environment. As a result, Plaintiff's hostile work environment ADA claim would fail even if it were timely.

    2.    <u>Plaintiff's IWA and Retaliatory Discharge Claims</u>

The IWA provides that an employer "may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation

of a State or federal law, rule, or regulation." 740 Ill. Comp. Stat. 174/15(b). In his complaint, Plaintiff alleged that the City violated the IWA because it fired him in retaliation for his blowing the whistle on corruption—specifically, the DSS policies of nepotism and favoritism. *See* [66], ¶¶ 129–130.[3]

Because the basis of this claim has been a bit of a moving target, the Court asked Plaintiff's counsel to clarify precisely what violations of what State or federal law, rule, or regulation Plaintiff claimed to have disclosed. Counsel clarified at oral argument on summary judgment that Plaintiff's IWA claims are predicated solely upon his disclosure of a violation of section 2-156-005 of the City of Chicago's municipal code. According to Plaintiff, that section precludes city employees from giving any individual preferential treatment, and also compels city employees to disclose waste fraud, abuse, and corruption. Plaintiff claims that being pressured to cover for Kenneth Austin would amount to giving someone preferential treatment and disclosing the lies to OIG constituted an attempt to disclose such corruption to the appropriate authority. Plaintiff also conceded that the factual predicate remains the same for both the whistleblowing claim and the retaliatory discharge claim.

Initially, Plaintiff does not claim that he disclosed a violation of a State or federal law, rule, or regulation; he claims he disclosed a violation of a City

---

[3] In the TAC, Plaintiff also alleged that he "refused to participate in an activity that would result in a violation of a state law, rule, or regulation." [66], ¶ 133. This allegation suggested a claim for violation of section 20 of the IWA, which prohibits retaliation for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation. 740 Ill. Comp. Stat. 174/20. Counsel waived this claim at oral argument. But even if she had not waived it, any claim under this section would fail for the same reasons his claim for violation of Section 15 fails.

12

ordinance. More specifically, Plaintiff claims that he disclosed a violation of the City of Chicago's governmental ethics ordinance, section 2-156-005. The alleged violation thus is not only not a federal or state law, rule, or regulation, as required under the plain language of the IWA, it is not even a criminal statute. Disclosing a violation of the ordinance is not the same as disclosing criminal activity, which remains the primary focus of the IWA. *E.g., Huang v. Fluidmesh Networks, LLC*, No. 16-CV-9566, 2017 WL 3034672, at *3 (N.D. Ill. July 18, 2017) (The purpose of the IWA is "to protect employees from adverse employment actions in retaliation for reporting or refusing to engage in unlawful conduct by their employers."). Despite this critical distinction, Plaintiff has offered no authority to suggest that the IWA is broad enough to cover a claim based solely upon an alleged ordinance violation. *See, e.g., United States v. Rosenbohm*, 564 F.3d 820, 823 (7th Cir. 2009) ("If the language of a statute is clear and unambiguous, 'in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'") (quoting *United States v. Turkette*, 452 U.S. 576, 580 (1981)).

More importantly, even if the IWA could cover the disclosure of a violation of a municipal ordinance, the undisputed evidence shows that Plaintiff failed to disclose any such violation. Indeed, the transcript of Plaintiff's May 29, 2013 interview shows that Plaintiff did not disclose corruption or any preferential treatment. At the second interview Plaintiff corrected his prior statement (indicating that he was the driver at the time of the accident) to now state that, in

fact, Kenneth Austin was driving the truck at the time of the accident. [110-5], at p. 11. But when asked why he lied, he stated: "Well, the reason was, like I say, childhood friend. His mother and my mother are very good friends, and I just–just took it upon myself to do so." *Id.* at p. 24. Plaintiff stated that Austin did not ask him to lie; he stated that he was not aware of any hits on Austin's license and had no reason to think that Austin would get in any more trouble than he would because of the accident. *Id.* at pp. 27, 28. He stated that he took it upon himself to protect Kenneth Austin. *Id.* at p. 28. When the attorney from the OIG asked Plaintiff if he was sure that no one asked him to lie about who was driving, he said "positive." *Id.* Even when the attorney expressed skepticism, Plaintiff continued to deny any corruption, coercion, duress, intimidation, or malfeasance:

> Q. I'm just trying to understand what changed your mind about telling people who was driving; and, Darrell, if somebody else encouraged you to do it, if it was Ken, if it was Lemuel, if it was somebody else that encouraged you, I mean, now would be the time to tell us.
>
> A. No, really no one encouraged me, it upon myself to do that. Like I say...
>
> Q: We're trying to figure out why, why do you take it upon yourself. I mean, I guess what we're trying to figure out is why would you take the rap for an accident if in your mind at that time Mr. Austin hadn't done anything wrong, if he was the driver. You guys were rear ended, no fault of yours. So what's the harm if Mr. Austin is behind the wheel if that accident were to occur because you were under the belief that there was nothing wrong with his license.
>
> A: I can say I was under the belief that nothing was wrong with his license. I had no knowledge of his license or anything. I never asked any questions about his driver's license, so I had no knowledge. . . . I took it upon myself because I was under the impression that having the alderman's son involved in an accident or something would bring bad publicity or something. Then I felt a little pressure as well when

14

everyone showed up, you know, I guess, with great expectation of thinking that maybe I should step up and possibly do what I thought was right.

Q. Right by who?

A. By them.

Q. Who is them?

A. Harold Irving.

Q. Just Harold Irving?

A Yeah.

Q. Why do you say Harold Irving and not Ken Austin or anybody else?

A. There's been some times in the past where I have been–say the word, I guess, harassed by Harold Irving, and I just felt pressured.

Q. Did he do anything that particular day to make you feel pressured, harass you, intimidate you?

A. Not to my knowledge.

Q. So this is still a decision that you arrived at yourself when you told the police that you were the driver?

A. That's correct.

Q. Nobody tried to influence you in any way?

A. No.

[110-5], pp. 29–30, 44–45.

Later in the interview, counsel for the OIG asked, "as you sit here today, the decision to tell the police and initially us that you were the driver was 100 percent yours? Nobody told you–I mean, it was a decision you arrived at 100 percent by yourself without any influence whatsoever from anybody?" *Id.* at p. 52. Plaintiff's

15

attorney objected: "I don't think that you can characterize that. . . . Because he had already said that he felt some influence in the room when everyone showed up at the police station. He did say that, so I just want to make sure it's clear." *Id*. And the following colloquy ensued:

> Q. True. So you did feel some influence by the people being physically present?
>
> A. Yes.
>
> Q. Okay.
>
> MR. CLEVELAND: But no one told him that.
>
> BY MR. SERIO: Q. That's what I want to clear up. Nobody in any way told you to tell police that you were driving?
>
> A. No.
>
> Q. And that was a decision that, with a little bit of influence by people just being present, you arrived at by yourself?
>
> A. Correct.
>
> Q. Why did you think that it would be a – I don't want to put words in your mouth. The reason you did it was you didn't want any disrepute to be brought to Carrie Austin or to Harold Irving?
>
> A. Not Harold Irving.
>
> Q. Just Carrie Austin?
>
> A. Just Carrie Austin.
>
> Q. Why did you think that her son being involved in a car accident that wasn't his fault why would that reflect negatively on her or even Ken?
>
> A. I just thought maybe, you know, the media get ahold of something like that and just blow it out of proportion, so I took it upon myself to make the decision.

16

*Id.* at 53. In short, though given ample opportunity and encouragement, Plaintiff did not disclose any violation of the ethics ordinance.

Later at his deposition, Plaintiff conceded that he did not tell the OIG that anyone had pressured him to lie or intimidated him into protecting Kenneth Austin. [110-3], p. 43. Plaintiff testified that although he told the truth about who was driving in 2012, he remained mum about why he initially lied because he continued to feel intimidated. He testified that he had heard a rumor that everything he said in the interview would be reported back to Alderman Austin, so he still did not feel comfortable disclosing the whole truth; he did not want to be seen as a "snitch," and he "was still fearing for my safety and my job." *Id.* at p. 40. When asked if he lied because he did not want word getting back to Alderman Austin about his testimony, he testified that he "still had to work with these people and I was going through enough harassment and being threatened, so yes." *Id.* at p. 42.

None of this testimony helps Plaintiff. In this lawsuit he claims a violation of the Illinois Whistleblower Act and retaliatory discharge, both of which are predicted (by his own admission) on his claim that he disclosed, in the second OIG interview, a violation of City of Chicago Municipal Code Section 2-156-005. Plaintiff's testimony confirms that he did not disclose any such violation to the OIG during the second interview. If he cannot show that he disclosed a violation, he necessarily cannot show that the City fired him because he disclosed the violation. As a result, Defendant is entitled to judgment as a matter of law on Plaintiff's IWA and retaliatory discharge claims as well.

## Conclusion

For the reasons explained above, the Court grants Defendant's motion for summary judgment [109]. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff on counts III, IV, and V of Plaintiff's third amended complaint. All set dates, including the October 21, 2019 trial date, are stricken. Civil case terminated.

Dated: September 30, 2019

ENTERED:

_____
John Robert Blakey
United States District Judge